**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MELISSA GORBY,<br><br>          Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>          Defendant. | CASE NO. 5:21-CV-00747<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**<u>MEMORANDUM OPINION AND ORDER</u>** |

Plaintiff Melissa Gorby ("Plaintiff" or "Ms. Gorby") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1, ECF Doc. 13.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned pursuant to the consent of the parties. (ECF Doc. 17.)   For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

### A.      Prior Application

In a decision dated April 25, 2006, Ms. Gorby was found disabled under the Social Security Act on and after July 11, 2001, continuing through the date of the April 25, 2006 decision.  (Tr. 70-80, 86.)   The state agency later found Ms. Gorby no longer disabled as of

January 24, 2013.  (Tr. 84.)  On December 14, 2017, an Administrative Law Judge ("ALJ")

issued an unfavorable decision, finding Ms. Gorby's disability ended on January 24, 2013, and

she had not become disabled since that date.  (Tr. 81-107.)  On May 29, 2018, the Appeals

Council denied Ms. Gorby's request for review of the 2017 decision.  (Tr. 148-53.)

**B.      Current Application**

Ms. Gorby protectively filed new applications for Disability Insurance Benefits and

Supplemental Security Income on September 17, 2019.  (Tr. 16, 108, 109, 223-29, 230-36.)   She

asserted a disability onset date of March 30, 1969 (Tr. 16, 223, 230), and alleged she was

disabled due to multiple medical conditions, including a neck injury.  (Tr. 111, 131, 158, 172.)

Her applications were denied at the initial level (Tr. 154-63) and upon reconsideration (Tr. 168-

75).  She requested a hearing (Tr. 176-77), which was held before the same ALJ on September 4,

2020 (Tr. 33-69).  On September 8, 2020, Ms. Gorby dismissed her claim for Disability

Insurance Benefits and amended her disability onset date to September 17, 2019.  (Tr. 17, 257.)

On September 30, 2020, the ALJ issued an unfavorable decision, finding Ms. Gorby not

disabled within the meaning of the Social Security Act.  (Tr. 13-32.)  Ms. Gorby requested

review of the decision by the Appeals Council.  (Tr. 219-22.)   On February 18, 2021, the

Appeals Council denied her request for review, making the ALJ's decision the final decision of

the Commissioner.  (Tr. 1-7.)

## II.      Evidence

Although the ALJ identified multiple severe physical and mental impairments (Tr. 19),

Ms. Gorby's challenge to the ALJ's decision pertains to the evaluation of her cervical

spondylosis.  (ECF Doc. 13 pp. 1, 11-14.)  The evidence summarized herein is accordingly

focused on her cervical spine impairment.

A.      **Personal, Educational, and Vocational Evidence**

Ms. Gorby was born in 1969.  (Tr. 26, 223, 230.)  She was fifty years old at the time of her amended alleged onset date in 2019.  (Tr. 43.)  She has a high school education.  (Tr. 26.)  She has no past relevant work.  (Tr. 26, 44-45, 64.)

B.      **Medical Evidence**

1.      **Treatment History**

Ms. Gorby's primary care physician was John Mannos, D.O.  (Tr. 447, 455.)  He referred her to Tri County Orthopedic Surgeons, Incorporated for evaluation ("Tri County") after complaining of cervical spine symptoms.  (Tr. 455.)

Ms. Gorby presented to Daniel N. Moretta, D.O. at Tri County on October 30, 2019, stating that her cervical spine symptoms started on August 20, 2019 when she carried a very heavy basket filled with "laundry, a cantaloupe, half gallon of milk and laundry soap."  (*Id*.)  She reported that she thought she "pulled something or over worked herself carrying" it.  (*Id*.)  She explained that she had broken her neck when she was two years old, but denied a history of cervical spine surgery.  (*Id*.)  She complained of severe neck pain, bilateral shoulder pain, and occasional sharp and bad head pains.  (*Id*.)  She also complained of intermittent numbness and tingling in the fingers of her left hand and stiffness and limited range of motion in her neck.  (*Id*.)  She was in no acute distress, had a normal gait, and displayed no tenderness to palpation of the paravertebral cervical spine.  (*Id*.)  Her cervical examination also reflected full motor strength and full range of motion with active range of motion with side bending, rotation, flexion, and extension.  (Tr. 456.)  Spurling maneuver and Hoffman's sign were negative bilaterally.  (*Id*.)  Cervical spine x-rays showed no evidence of fracture, scoliosis, or instability, but moderate disc space narrowing at C4-5, C5-6, and C6-7 and mild anterior syndesmophytes at C5 and C6.  (*Id*.)

3

She was diagnosed with cervical spondylosis.  (*Id*.)  Dr. Moretta indicated that she had "cervical pain with no radicular symptoms and with degenerative changes on cervical xray," with no concern for myelopathy.  (*Id*.)  Dr. Moretta recommended conservative treatment, including physical therapy, icing, and ibuprofen and Tylenol.  (*Id*.)

On November 19, 2019, Ms. Gorby presented for an initial physical therapy assessment at Mercy Medical Center.  (Tr. 487-91, 517-20.)  Following the assessment, the recommendation was physical therapy twice each week for eight weeks.  (Tr. 490, 520.)  She returned for her next physical therapy appointment on November 21, 2019, but reported that she did not feel comfortable proceeding due to increased pain; she wanted to discuss her concerns with Dr. Moretta before continuing with therapy.  (Tr. 485-86.)

On December 11, 2019, Ms. Gorby returned to Dr. Moretta. (Tr. 513-16.)  She reported no change in her symptoms.  (Tr. 513.)  She indicated that her neck pain was constant and stated that her neck popped when she moved it.  (*Id*.)  She reported several brief episodes of numbness and radicular pain in her bilateral upper extremities, occurring with movement of her cervical spine.  (Tr. 514.)  She reported attending physical therapy twice, but said it aggravated her symptoms.  (Tr. 513.)  She was taking ibuprofen 600 mg as needed with some relief.  (*Id*.)  She was in no acute distress, had a normal gait, and displayed no tenderness to palpation of the paravertebral cervical spine.  (*Id*.)  Examination findings also included negative Spurling maneuver and negative Hoffman's sign on right.  (*Id*.)  Dr. Moretta explained to Ms. Gorby that the sensations in her neck were related to her osteoarthritis and did not require surgical intervention.  (Tr. 514.)  He indicated they would monitor her symptoms and she should continue physical therapy.  (*Id*.)  Ms. Gorby has not identified evidence suggesting that she returned to physical therapy.

Ms. Gorby returned to Tri County on January 14, 2020, and saw Jeffrey Cochran, D.O. for follow up regarding her cervical spine.  (Tr. 510-12.)  She again reported attending only two physical therapy sessions, explaining that she stopped attending due to "pain and neck 'cracking and popping.'"  (Tr. 510.)  She also said she had intermittent neck pain that was "activity related with limited [range of motion]," as well as substantial numbness and tingling in her hands, greater on the left than right.  (*Id*.)  She reported that her symptoms improved with anti-inflammatories, but that she was not taking anything for her pain at that time.  (*Id*.)  On examination, she was in no acute distress and her gait pattern was normal.  (*Id*.)  Dr. Cochran noted no tenderness to palpation of the paravertebral cervical spine, but tenderness to palpation of the "midcervical, midline region."  (*Id*.)  Her cervical spine examination reflected full range of motion with flexion and extension, but limited range of motion with bilateral bending and rotation to 30 degrees.  (*Id*.)  Her motor strength was normal.  (Tr. 511.)  Hoffman's sign was negative, but Spurling maneuver was positive bilaterally, greater on the left than right.  (*Id*.)  Dr. Cochran noted there was "high suspicion for nerve impingement," and recommended a cervical MRI to assess the cause of her radicular symptoms.  (*Id*.)  He advised her to continue with her medications and to use ice for symptomatic relief.  (*Id*.)

On January 27, 2020, Ms. Gorby had a cervical spine MRI.  (Tr. 492-94, 507-09.)  The impression was: overall moderate degenerative changes of the cervical spine with multi-level degenerative disk disease, facet arthrosis, and uncovertebral hypertrophy; mild to moderate spinal canal stenosis at the C4-5, C5-6 and C6-7 levels with effacement of the ventral CSF space and narrowing of the dorsal CSF space and ventral cord flattening noted at the three levels; and multi-level neural foraminal stenosis. (Tr. 493-94, 508-09.)

Ms. Gorby returned to Dr. Moretta on February 5, 2020, complaining that her symptoms were "a little worse than last time."  (Tr. 503.)  She described her neck pain as "sharp, aching, burning, nearly constant and activity related."  (*Id*.)  She also reported numbness bilaterally and limited range of motion and "popping" in her neck.  (*Id*.)  She stated that bending, twisting, lifting, or carrying items aggravated her symptoms, and that her symptoms were improved with rest, NSAIDs, and heat. (*Id*.)  She was taking ibuprofen with some relief.  (*Id*.)   On examination, she was in no acute distress.  (*Id*.)  She ambulated without assistance and demonstrated 5/5 strength in all myotomes.  (Tr. 503-04.)   She displayed tenderness on palpation during her cervical examination, and Spurling maneuver was positive centrally.  (*Id*.)  She also displayed diminished reflexes in the triceps, biceps, and brachioradialis bilaterally, and positive Tinels at the cubital and carpal tunnel bilaterally.  (*Id*.)  Dr. Moretta reviewed the MRI.  (*Id*.)   He diagnosed cervical spondylosis and stated that she had "some degenerative changes but [was] neuro intact on exam" that day.  (*Id*.)  He noted that most of her pain was in her neck, and that she was a good candidate for epidural injections.  (*Id*.)  He prescribed Mobic and directed her to return if her symptoms were not relived by injections.  (*Id*.)

Ms. Gorby has not identified any evidence suggesting that she sought epidural injections or returned to Tri County for further treatment relating to her cervical condition after February 5, 2020. (*See* ECF Doc. 13, pp. 7-8; *see also* ECF Doc. 15, p. 4.)

### 2.    Opinion Evidence

#### i.    Treating Source

On February 14, 2020, Dr. Mannos completed a Physician Questionnaire – (Seizures). (Tr. 524-25.)  Dr. Mannos stated he treated Ms. Gorby for a seizure disorder since 2005.  (Tr. 524.)  He listed symptoms including paresthesias of her face and hands, visual loss, and

confusion.  (*Id*.)  He opined she could not sit more than one to two hours in an eight-hour work day, she could not stand or walk even an hour in an 8 hour work day, and she could lift only 1-2 pounds occasionally.  (*Id*.)  He also opined that she would require unscheduled breaks and would miss work on a weekly basis due to her medical condition.  (Tr. 524-25.)  In addition, he opined that she would be incapable of even low stress work, and that side effects from her seizure medications included dizziness, lethargy, eye focusing problems, coordination disturbance, and lack of alertness.  (Tr. 525.)

### ii. State Agency Medical Consultants

On January 10, 2020, state agency medical consultant Yeshwanth Bekal, M.D. did not adopt the prior RFC findings from December 2017 because he found new and material evidence demonstrated a change in Ms. Gorby's condition.  (Tr. 125.)  Dr. Bekal found that Ms. Gorby had the RFC to:

- lift and/or carry twenty pounds occasionally and ten pounds frequently;

- stand and/or walk for six hours in an eight-hour workday;

- sit for six hours in an eight-hour workday;

- never climb ladders/ropes/scaffolds;

- frequently climb ramps/stairs and stoop;

- occasionally kneel, crouch, and crawl; and

- avoid exposure to unprotected heights.

(Tr. 124-25.)

On March 28, 2020, state agency medical consultant Steve McKee, M.D. opined upon reconsideration that Ms. Gorby had the RFC outlined in Dr. Bekal's opinion, but with additional RFC limitations, including: frequent pushing and pulling with the bilateral upper extremities;

7

occasional overhead reaching with the bilateral upper extremities; and avoidance of commercial driving and dangerous machinery.  (Tr. 143-45.)  Dr. McKee explained that his RFC was supported by additional evidence that showed some cord flattening on the MRI but no cord compression, and normal strength but "DTRs diminished" in bilateral upper extremities.  (*Id*.)  Dr. McKee also considered the opinion of Dr. Mannos, but noted that the opinion "almost [made] it sound as if [Ms. Gorby] [was] bed ridden," when "exams note[d] good strength and gait" and she did not need assistance walking.  (Tr. 143.)  Dr. McKee noted that the opinion appeared to be based more on Ms. Gorby's complaints of pain than objective findings.  (*Id*.)

**C.    September 4, 2020, Hearing**

**1.    Plaintiff's Testimony**

Ms. Gorby testified in response to questioning by the ALJ and her representative.  (Tr. 45-63.)  She explained that she started having pain in her neck around October 2019 after carrying laundry.  (Tr. 53-55.)  She also stated that she broke her neck when she was two and had since found out that she had arthritis that was "degenerating."  (Tr. 54.)  If she moved suddenly, she said her whole spine would lock up.  (*Id*.)  She described her pain as follows:

> I have burning.  Just sitting here, I have to keep adjusting myself.  I have shooting numbness in both my hands.  Maybe, I don't know, it's what I did today, I have a terrible pain in my right arm.  I've got to go back to the doctor and I just don't want to in this Corona virus stuff.  But numbness in my hands.  I drop things.  I don't know if that has anything to with [my] neck.  We're trying to figure all this stuff out.  But it's been, it's been happening forever.

(Tr. 55.)

When asked about treatment she had received for her neck condition, she testified that she did physical therapy but the physical therapist told her "it was more painful for [her] to be moving it than for [her] not to be moving it."  (*Id*.)  She explained her neck "just cracks and pops and snaps."  (*Id*.)  She reported seeing pain management, who started her on a TENS unit, but

said that did not make much of a difference.  (*Id*.)  She also reported that pain management

recommended shots.  (*Id*.)  She testified that her pain limited everything for her.  (Tr. 55-56.)

She had to turn her whole body to look around her and the numbness in her hands was very

debilitating.  (Tr. 56.)  She also testified that she was unable to carry an item that weighed less

than ten pounds.  (*Id*.)  She reported that one of her doctors, whose name she could not recall,

wanted her to have neck surgery but she did not feel it would help very much.  (Tr. 56-57.)  She

reported having problems walking, standing, and sitting.  (*Id*.)

   2.     **Vocational Expert's Testimony**

   A Vocational Expert ("VE") testified at the hearing.  (Tr. 63-68.)  The ALJ explained

there was no past relevant work.  (Tr. 64.)  For all her hypotheticals, the ALJ asked the VE to

assume an individual Ms. Gorby's age and with her education and no past relevant work.  (*Id*.)

For her first hypothetical, the ALJ asked the VE to assume an individual who:

> could occasionally lift and/or carry including up to pulling 20 pounds.  Could
> frequently lift and/or carry including up to pulling ten pounds.  The individual could
> stand and/or walk with normal breaks for a total of about six hours in an eight-hour
> workday and sit with normal breaks for about six hours in an eight-hour workday.
> With respect to pushing and pulling, the individual could frequently [push] and/or
> pull with the bilateral upper extremities.  Otherwise, the individual is limited as
> what was shown for lifting or carrying.  The individual could frequently climb
> ramps and stairs.  Frequently stoop.  Occasionally kneel, crouch or crawl.  Never
> climb ladders, ropes and scaffolds.  The individual is limited to occasional overhead
> reaching bilaterally.  Occasional overhead reaching with the bilateral upper
> extremities.  The individual should avoid concentrated exposure to pulmonary
> irritants including -- such as dust, fumes, odors, dust and gases.  And the individual
> should avoid no commercial driving.  Should avoid commercial driving.  Should
> avoid unprotected heights.  Should avoid hazardous machinery.  Should avoid open
> unprotected water and then let's see if I can describe this.  It's something I saw one
> of her providers wrote.  The individual should not work around -- should not work
> in a work area or with equipment where there's a risk of being burned.  So the
> individual shouldn't work around things such as hot water, hot oil, open flame,
> ovens and the like.  And then I have the following additional limitations.  The
> individual is able to work in a work environment where there's only occasional
> interaction with co-workers and the public.  There should be no work involving
> customer service duties, confrontation, conflict resolution, directing the work of

others, or persuading others.  And it would be a work environment where there are
only occasional changes in workplace tasks or duties, with any such changes being
gradually introduced and explained in advance.

(Tr. 64-65.)  The VE testified that the described individual could perform the jobs of electronics

worker, hand packager, and mailroom clerk.  (Tr. 65-66.)

For her second hypothetical, the ALJ asked the VE to assume the first hypothetical with

one change.  (Tr. 66.)  The individual could "occasionally lift and/or carry including upward

pulling ten pounds."  (*Id*.)  The VE testified that the individual would be limited to sedentary

exertional level jobs with that change.  (*Id*.)  The ALJ then stated: "Okay.  So that would be a

grid situation."  (*Id*.)

The VE testified that missing more than two days per month because of one's

impairments or being off task more than 10% of the time in an eight-hour workday on a regular

and ongoing basis would not be considered full-time competitive employment. (Tr. 66-67.)  Ms.

Gorby's counsel then asked the VE whether his answer to the first hypothetical would change if

the following was added to the first hypothetical: occasional handling and fingering bilaterally.

(Tr. 67.)  The VE responded that there would be no competitive employment.  (*Id*.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments

depends on the existence of a disability.  Disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

An individual shall be determined to be under a disability only if his physical or
mental impairment or impairments are of such severity that he is not only unable to
do his previous work but cannot, considering his age, education, and work

10

experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.  The ALJ's Decision

The ALJ's findings are as follows:[2]

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.  (Tr. 19.)

2.  The claimant has not engaged in substantial gainful activity since March 30, 1969, the alleged onset date.  (*Id.*)

3.  The claimant has the following severe impairments: cervical spondylosis, seizure disorder/paroxysmal episode concerning for seizures, migraines, obesity, depression and anxiety.  (*Id.*)

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 19-22.)

5.  The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can occasionally lift and/or carry (including upward pulling) 20 pounds occasionally and 10 pounds frequently.  She can stand, walk or sit (with normal breaks) for six hours in an 8-hour workday.  She can push and/or pull (including the operation of hand/foot controls) frequently with the bilateral upper extremities, otherwise limited as shown for lift and/or carry.  She can frequently climb ramps or stairs.  She can frequently stoop.  She can occasionally kneel, crouch or crawl.  She is unlimited with balance.  She can never climb ladders, ropes or scaffolds.  She is limited to occasional overhead reaching with the bilateral upper extremities.  She must avoid concentrated exposure to pulmonary irritants, such as fumes, odors, dust and gases.  She can perform no commercial driving.  She cannot perform work at unprotected heights or around hazardous machinery.  She cannot work around open unprotected water.  She cannot perform work around hot water, hot oil, open flames, ovens or other work areas with equipment which have a risk of being burnt by hot water, hot oil, open flames, ovens and the like.  She is able to work in an environment where there is only occasional interaction with coworkers and the public, and where there are no work tasks involving customer service duties, confrontation, conflict resolution, directing the work of others, or persuading others.  She can work in an environment where there are only occasional changes in the work place tasks or duties,

---

[2] The ALJ's findings are summarized.

with any such changes being gradually introduced and explained in advance. (Tr. 22-26.)

6.   The claimant has no past relevant work.  (Tr. 26.)

7.   The claimant was born in 1969, defined as a younger individual age 18-49, on the alleged onset date and subsequently changed age category to closely approaching advanced age.  (*Id*.)

8.   The claimant has at least a high school education.  (*Id*.)

9.   Transferability of job skills is not an issue because claimant does not have past relevant work.  (*Id*.)

10.  Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (Tr. 26-27.)

Based on the foregoing, the ALJ found Ms. Gorby had not been under a disability as defined in the Social Security Act from March 30, 1969 to the date of the decision.  (Tr. 27.)

## V.   Plaintiff's Argument

Ms. Gorby argues that the ALJ's finding at Step Five is not supported by substantial evidence because the ALJ did not conduct an adequate evaluation of the limitations resulting from her cervical spondylosis.  (ECF Doc. 13, pp. 1, 11-14.)

## VI.   Law & Analysis

### A.   Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.    Sole Assignment of Error: Whether ALJ's Evaluation of Cervical Spondylosis Was Supported by Substantial Evidence**

Ms. Gorby argues that the ALJ's finding at Step Five that she could perform a significant

number of jobs is not supported by substantial evidence because the ALJ did not conduct an

adequate evaluation of the limitations resulting from her cervical spondylosis.  (ECF Doc. 13, pp.

1, 11-14.)  In connection with that argument, she also contends that the ALJ did not acknowledge

the worsening of her cervical condition since a prior 2017 ALJ decision.  (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's physical RFC

and her evaluation of Ms. Gorby's subjective symptoms.  (ECF Doc. 15, pp. 8-15.)  The

Commissioner also argues that the ALJ properly considered Ms. Gorby's claim in light of the

principles set forth in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) and

*Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018).  (*Id*. at pp. 6-8.)

**1.    Whether ALJ Appropriately Considered Worsening of Cervical Impairment**

Ms. Gorby argues the ALJ failed to acknowledge the deterioration of her cervical

condition since the prior ALJ decision in 2017.  Specifically, she asserts that "there has been new

and material evidence showing a deterioration in [her] condition" that the ALJ erroneously failed

to acknowledge.  (ECF Doc. 13, p. 14.)  The Court will accordingly address whether the ALJ

appropriately considered new and material evidence of worsening since the prior ALJ decision.

In *Drummond*, the Sixth Circuit cited to "the principles of res judicata" in holding:

"Absent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by

the findings of a previous ALJ."  126 F.3d at 841-42.  In a related Acquiescence Ruling, the

Social Security Administration ("SSA") applied *Drummond* to disability findings as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method of arriving at the finding.

AR 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998).

In *Earley*, the Sixth Circuit reexamined *Drummond* and its reliance on principles of res judicata, and observed: "Unusual facts, it seems to us, led to some overstatement in *Drummond* but not to an incorrect outcome." 893 F.3d at 933. While the standard in *Drummond* was based on res judicata principles, the *Earley* Court clarified that "res judicata only 'foreclose[s] successive litigation of the very same claim,'" while "'a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994.'" *Id.* (citations omitted). This fact, argued the Sixth Circuit, "helps to explain why *Drummond* referred to 'principles of res judicata' – with an accent on the word 'principles.'" *Id.* (citing 126 F.3d at 841–43). In other words, the *Earley* Court held that res judicata is not truly the standard at issue when a claimant seeks benefits for a new period of disability.

In clarifying the applicable standard, the Sixth Circuit indicated *Drummond*'s holding was not actually an issue of "preclusion," but was instead "'best understood as a practical illustration of the substantial evidence rule' in which the prior factual finding was 'such an important and probative fact as to render the subsequent finding to the contrary unsupported by substantial evidence.'" *Id.* at 934 (citing *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476–77 (4th Cir. 1999)). In articulating the Sixth Circuit standard going forward, the *Earley* Court explained: "Fresh review is not blind review. A later administrative law judge may

16

consider what an earlier judge did if for no other reason than to strive for consistent decision making."  *Id.* at 934.

In her September 30, 2020 decision, the ALJ explicitly held that new evidence showed a material change beginning December 15, 2017, and therefore "concluded that [she] [would] not adopt those [earlier] findings because the evidence . . . support[ed] a new finding."  (Tr. 17.)  She then adopted an RFC that included additional limitations based on Ms. Gorby's worsening cervical impairments.  (Tr. 22.)  Thus, consistent with *Earley*, the ALJ conducted a fresh review and considered evidence of Ms. Gorby's worsening cervical impairment.  The Court accordingly finds the ALJ appropriately considered worsening since the prior ALJ decision when deciding Ms. Gorby's claim.  As the *Earley* court explained, the required analysis is a "substantial evidence" standard.  Accordingly, the Court will turn next to the question of whether the RFC is supported by substantial evidence.

### 2.  Whether ALJ Properly Considered Subjective Symptoms and Sufficiently Articulated Basis for RFC Finding in Light of Those Symptoms

Ms. Gorby argues that the ALJ's Step Five finding is not supported by substantial evidence because the ALJ did not conduct an adequate evaluation of limitations caused by her cervical spondylosis or adequately explain why she found Ms. Gorby's subjective symptoms not entirely consistent with the record.  (ECF Doc. 13, pp. 11-14.)  More particularly, she asserts that the ALJ's determination that her subjective symptoms allegations were not entirely consistent with medical and other evidence in the record was in error because she did not consider abnormal examination findings (*id.* at p. 13) and did not provide "any type of adequate explanation for rejecting Ms. Gorby's complaints of pain" (*id.* at p. 14).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable

17

impairment that could reasonably be expected to produce the claimant's symptoms.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a))*.*  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 23), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 404.1529(c)(3).  Here, a review of the decision reveals that the ALJ considered the entire record, based her findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.

Specifically, the ALJ acknowledged that Ms. Gorby alleged "disability due to degenerative disc disease of the cervical spine," but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 23*.*)  In support of this finding, the ALJ considered objective medical evidence and treatment modalities and provided the following explanation for her conclusions:

> [O]bjective medical evidence does not support the frequency and severity of the claimant's allegations. X-rays of the claimant's cervical spine showed moderate

18

disc space narrowing seen at C4-C5, C5-C6, and C6-C7, mild anterior syndesmophoytes seen at C5 and C6. (B5F, 2) Magnetic resonance imaging of the claimant's cervical spine showed overall moderate degenerative changes of the cervical spine are noted with multilevel degenerative disk disease, facet arthrosis, and uncovertebral hypertrophy, mild to moderate spinal canal stenosis is noted at C4-C5, C5-C6 and C6-C7 with effacement of the ventral CSF space and narrowing of the dorsal CSF space, with no or cord compression or abnormal signal identified; ventral cord flattening is noted at these three levels; multilevel neural foraminal stenosis. (B7F, 27, 28) On examination, the claimant has had normal strength, some tenderness to palpation, to be neurologically intact, some limit on range of motion and no concern for myelopathy. (B5F, 1, 2, B8F, 2, 8, 9) She ambulates without assistance and with normal gait and station. (B8F, 1, B5F, 1, B4F, 5, B11F, 9) Overall, the claimant was treated conservatively, although she only went to two physical therapy appointments. (B8F, 8, B7F, 20, B5F, 2) She was then referred for epidural injections. (B8F, 2) The claimant has not been referred surgery or any further treatment for the same.

(*Id*.)  The ALJ also considered Ms. Gorby's activities of daily living, stating:

Despite the restrictions caused by the claimant's impairments, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged. The claimant lives alone. (B6F, 3, B11F, 2) The claimant is able to see to her activities of daily living such as her daily hygiene, household chores, shopping for groceries, and preparing basic meals. (B6F, 3) She spends her days playing video games. (B6F, 3) The claimant has reported having a puppy, enjoying learning about herbs and walking. (B2F, 59)

(Tr. 25.)

The ALJ additionally considered the opinions of the state agency medical consultants, including Dr. McKee's opinion that Ms. Gorby had the RFC to perform a reduced range of light work with certain limitations designed to account for her cervical impairment.  (Tr. 144.)  Those limitations included frequent pushing/pulling with bilateral upper extremities and occasional overhead reaching with bilateral upper extremities.  (*Id*.)  The ALJ incorporated those cervical limitations into her RFC finding, explaining: "As the claimant has complained of some neck and shoulder pain, she is limited to frequent pushing and pulling with bilateral upper extremities, and occasional overhead reaching with bilateral upper extremities" (Tr. 22, 25).  The ALJ also limited Ms. Gorby to light work with postural and environmental limitations.  (*Id*.)

19

Ms. Gorby contends the ALJ's evaluation of her subjective allegations was faulty because the ALJ failed to specifically consider:

> [her] clinical examination in January, 2020 which revealed positive bilaterally Spurling signs (Tr. 511) and her examination in February, 2020 which found positive Spurling maneuver and positive Tinel's at the cubital and carpal tunnel bilaterally (Tr. 504).

(ECF Doc. 13, p. 13.)  Although the ALJ did not specifically mention the positive Spurling and Tinel's signs in her decision, it is well-established that she was not "required to discuss each piece of data in [her] opinion, so long as [she] consider[ed] the evidence as a whole and reach[ed] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)); *see also Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) (noting a "failure to discuss … observations does not indicate that they were not considered" and "[a]n ALJ need not discuss every piece of evidence in the record for his decision to stand").  Thus, the question is whether the ALJ decision reflects that she considered the evidence as a whole and reached a reasoned decision.

Here, there is no dispute the ALJ accurately described Ms. Gorby's cervical imagery and treatment records.  She also specifically discussed January and February 2020 treatment records where the Spurling and Tinel's findings were noted, observing: "On examination, the claimant has normal strength, some tenderness to palpation, to be neurologically intact, some limit on range of motion and no concern for myelopathy."  (Tr. 23 (citing Tr. 504, 510-11).)  Beyond clinical examination findings, the ALJ accurately noted that Ms. Gorby's treatment was generally conservative, limited to two physical therapy sessions and a referral for epidural injections, with no surgical referral and no further treatment for the cervical impairment.  (Tr. 23.)  The ALJ also considered the opinion of a state agency medical consultant who reviewed the

cervical imagery and February 2020 examination findings and nevertheless opined that the limitations set forth in the RFC were sufficient.  (Tr. 25, 140, 144.)  While the ALJ did not specifically highlight the positive Spurling and Tinel's signs, it is evident that she considered the evidence as a whole and reached a reasoned decision.

For the reasons stated above, Ms. Gorby's additional argument that the ALJ failed to build an accurate and logical bridge between the evidence and her disability determination because she did not "provide any type of adequate explanation for rejecting [her] complaints of pain" (ECF Doc. 13, p. 14) must also be rejected.  The Court finds that the ALJ adequately considered Ms. Gorby's subjective allegations in the context of the record as a whole and made a decision supported by substantial evidence, including the addition of certain functional limitations to account for her cervical impairment.  Ms. Gorby has not met her burden to demonstrate that the ALJ erred in considering her subjective complaints of pain, and the ALJ adequately explained her reasons for finding the subjective complaints were not entirely consistent with other evidence in the record.

The Court also returns briefly to Ms. Gorby's additional argument that the ALJ failed to acknowledge the deterioration in her cervical condition since the prior ALJ decision in 2017.  Ms. Gorby argues the ALJ should have limited her to sedentary exertional work because her testimony that she had difficulty lifting ten pounds was "reasonable given the severity of her cervical MRI findings and clinical examinations." (*Id*. at pp. 12-13.)  First, the ALJ did consider new and material evidence relating to Ms. Gorby's cervical impairment and assign RFC limitations that were more restrictive than those adopted in the 2017 ALJ decision.  (*Compare* Tr. 22 *with* Tr. 91.)  Second, the ALJ was not required to accept Ms. Gorby's subjective allegations as true or incorporate them into the RFC.  *See Jones*, 336 F.3d at 476.

Indeed, even if substantial evidence supports a limitation to sedentary work, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* at 477.  As recently explained by the Sixth Circuit:

> [A]t issue in social security cases is not whether [the court] would have reached the same decision on [the] record.  When determining whether to affirm the Commissioner's decision, [the court] need not "agree with the Commissioner's finding"; [the court] instead ask[s] whether the decision followed legal standards and "is substantially supported in the record."

*Bowers, v. Comm'r of Soc. Sec.*, No. 21-4069, 2022 WL 1277703, at *1 (6th Cir. Apr. 29, 2022) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)).)  Here, although Ms. Gorby continued to report pain and had some abnormal imagery and examination findings, she has not demonstrated that the ALJ's findings as to her subjective complaints lacked adequate explanation or were unsupported by substantial evidence.

For all of the reasons stated above, the Court finds no basis to remand this matter for further evaluation of limitations resulting from Ms. Gorby's cervical spondylosis.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.


March 7, 2023                                  */s/ Amanda M. Knapp*
                                               AMANDA M. KNAPP
                                               UNITED STATES MAGISTRATE JUDGE